## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**Ohio Right to Life Society, Inc.,**

      **Plaintiff,**

-V-                                 **Case No. 2:08-cv-00492**
                                             **JUDGE SMITH**
                                             **Magistrate Judge King**

**Ohio Elections Commission,** *et al.***,**

      **Defendants.**

### OPINION AND ORDER

On May 20, 2008, Plaintiff Ohio Right to Life Society, Inc. ("Plaintiff" or "ORTL")

initiated this case, with a Complaint for a Temporary Restraining Order and Preliminary and

Permanent Injunction (Doc. 2). On June 23, 2008, Plaintiff filed an Amended Motion and

Supporting Memorandum for Preliminary Injunction pursuant to Federal Rule of Civil Procedure

65 against Defendants Ohio Elections Commission ("OEC"), the individual Members of the

OEC ("OEC Members"), and Ohio Secretary of State Jennifer Brunner ("Secretary of State"),

seeking to enjoin Defendants from enforcing certain provisions of Ohio campaign finance law

regarding "electioneering communications" (Doc. 20). On July 18, 2008, Defendants filed a

Response (Doc. 30). On July 28, 2008, Plaintiff filed its Reply (Doc. 39). Both parties have

agreed that there is no need for an evidentiary hearing. For the following reasons, the Plaintiff's

Motion for a Preliminary Injunction is **GRANTED in part and DENIED IN PART.**

## I.    BACKGROUND

Plaintiff ORTL is a non-profit membership Ohio corporation, tax-exempt under Internal Revenue Code § 501(c)(4). (Compl. ¶ 6).  ORTL has been active in Ohio in articulating pro-life positions, and the mission of ORTL is to advance pro-life positions in Ohio legislation. (*Id*.).

Beginning in June 2008 through December 2008, ORTL desires and intends to run ads on broadcast media relating to Ohio Senate Bill 174, which would generally ban the practice of human cloning in Ohio. (*Id*. at ¶¶ 7-8).  ORTL indicates that the ads would provide as follows:

(i)     That Ohio Senate Bill 174 is an important public policy measure that should be enacted into law;

(ii)    That, to date, there has been no significant action on this important legislation;

(iii)   That concerned individuals should call one or more of the following Senators, each of whom is a Member of the Senate Judiciary-Civil Justice Committee to express their opinions, and request action on this legislation;

(iv)    That the broadcast commercials would expressly mention one or more of the following Ohio Senators to be called by the public:

Senate President Bill Harris
Senator David Goodman, Chair
Senator Kurt Schuring, Vice Chair
Senator Steve Buehrer
Senator Keith Faber
Senator Bill Seitz
Senator Steve Stivers
Senator Eric Kearney
Senator Teresa Fedor; and/or
Senator Lance T. Mason; and

(v)     The broadcast ads would contain no reference to the fact one or more of these Ohio Senators is a candidate for election at the November 4, 2008 general election, as "candidate" is defined in O.R.C. § 3501(H).

(*Id*. at ¶ 9).

ORTL has hired Wilson Grand Communications to create draft broadcast ads. (*Id.*).[1]

_____

[1]ORTL has provided the Court with two sample scripts created by Wilson Grand Communications.  The first script is designed for radio, is titled "Stop Cloning" and reads as follows:

> MALE NARRATOR: If you are pro life, help us stop human cloning in Ohio.
>
> We're Ohio Right to Life and we need your help to pass Senate Bill 174 - the ban on human cloning.
>
> These Senators need to hear from you.  (Read one or two names only).  Tell them you support SB 174.
>
> Human cloning is immoral.  It is unethical.
>
> Call Senators _____ and _____.
>
> Say you support Senate Bill 174 - the ban on human cloning.
>
> Paid for by Ohio Right to Life, Mike Gonidakis, Director.

(Compl.¶ 9, Ex. A).   The second script is also designed for radio, is titled "Line in the Sand" and reads as follows:

> WOMAN NARRATOR: If you believe in the Right to Life.
>
> MAN: If you oppose abortion.
>
> WOMAN: If you think partial birth abortion is a horrible indefensible procedure.
>
> MAN: Then help us.
>
> WOMAN: We are Ohio Right To Life.
>
> MAN: And we need your help to ban human cloning.
>
> WOMAN: The Ohio Senate is considering an important bill to ban human cloning.
>
> MAN: Senate Bill 174 will ban maveric scientists from cloning and experimenting on human embryos.

Plaintiff ORTL believes that its planned speech is in violation of various Ohio election laws and fears running the ads within 30 days of an election will subject it to extraordinary civil penalties and criminal prosecution. (*Id.* at ¶¶ 10-13).  In addition, Plaintiff believes its planned speech would trigger various reporting and disclosure requirements, a regulatory burden which would "hamper[] its ability to raise money for the proposed ad . . . ." (*Id.* at 10)  Consequently, Plaintiff ORTL has filed a complaint for a temporary restraining order and preliminary injunction seeking to enjoin Defendants from enforcing those provisions of Ohio campaign finance law regarding "electioneering communications" that it contends violate its First Amendment rights of freedom of speech and association.

---

WOMAN: Call state Senators _____ and _____.

MAN: Embryonic cloning has not produced one single cure.

WOMAN: But adult stem cells have produced near miraculous cures.

MAN: It is unethical to create embryos solely for the purpose of research.

WOMAN: We must draw a moral line in the sand.

WOMAN: We can not let companies profit by experimenting on human life.

MAN: Ohio must stop human cloning.

WOMAN: It is immoral.

MAN: So call state senators _____ and _____ and _____.

WOMAN: Tell them to pass Senate Bill 174 - the ban on human cloning.

MAN: Paid for by the Ohio Right to Life Society, Mike Gonidakis, Director.

(Compl.¶ 9, Ex. B).

-4-

**The Challenged Provisions**

The provisions of Ohio law challenged by Plaintiff ORTL were part of the campaign finance reforms enacted in Amended Substitute House Bill Number 1 ("H.B. 1") in December 2004 during a special session of the 125th Ohio General Assembly.  H.B. 1 became effective on March 30, 2005.  Specifically, Plaintiff challenges the provisions of O.R.C. § § 3517.01(B)(6) and 3517.1011, laws regulating "electioneering communication," and O.R.C. § 3517.992, the penalty sections.

O.R.C. § 3517.1011(A)(6)(a) defines "electioneering communication" as:

. . . any broadcast, cable or satellite communication that refers to a clearly identified candidate and that is made during either of the following periods of time:

(i)      If the person becomes a candidate before the day of the primary election at which candidate will be nominated for election to that office, between the date that the person becomes a candidate and the thirtieth day prior to that primary election, and between the date of the primary election and the thirtieth day prior to the general election at which a candidate will be elected to that office;

(ii)     If the person becomes a candidate after the day of the primary election at which candidate was nominated for election to that office, between the date of the primary election and the thirtieth day prior to the general election at which a candidate will be elected to that office.

O.R.C. § 3517.1011(H), Ohio's "blackout provision," prohibits the broadcasting of an electioneering communication during the 30 days preceding a general or primary election that is funded by contributions from a corporation or labor organization and provides:

No person shall make, during the thirty days preceding a primary election or during the thirty days preceding a general election, any broadcast, cable, or satellite communication that refers to a clearly identified candidate using any contributions received from a corporation or labor organization.

-5-

O.R.C. § 3517.01(B)(6) defines "Expenditure," as any spending "for the purpose of influencing the results of an election . . . ." The provision further provides:

> During the thirty days preceding a primary or general election, any disbursement to pay the direct costs of producing or airing a broadcast, cable, or satellite communication that refers to a clearly identified candidate shall be considered to be made for the purpose of influencing the results of that election and shall be reported as an expenditure or as an independent expenditure under section 3517.10 or 3517.105 of the Revised Code, as applicable, except that the information required to be reported regarding contributors for those expenditures or independent expenditures shall be the same as the information required to be reported under divisions (D)(1) and (2) of section 3517.1011 of the Revised Code.

Ohio's disclosure provision, O.R.C. § 3517.1011(D)(1)(a)-(f), requires any person who makes a disbursement in excess of $10,000 during any calendar year for the costs of producing and airing an "electioneering communication" to file a disclosure statement containing the following:

(a)     the full name and address of the person making the disbursement;

(b)     the principal place of business of the person making the disbursement, if not an individual;

(c)     the amount of each disbursement of more than one dollar during the period covered by the statement and the identity of the person to whom the disbursement was made;

(d)     the nominations or elections to which the electioneering communications pertain and the names, if known, of the candidates identified or to be identified,

(e)     For each contributor who contributed an aggregate amount of $200 or more to the person making the disbursement and whose contributions were used for making the disbursement, the following must be disclosed:

　　　(i)     the full name and address of the contributor, and, if the contributor is a political action committee, the registration number assigned to the political action committee;

　　　(ii)     if the contributor is an individual, the name of the individual's

-6-

current employer, if any, or, if the individual is self-employed, the individual's occupation and the name of the individual's business, if any;

(iii)    if the contribution is transmitted pursuant to section 3599.031 of the Revised Code from amounts deducted from the wages and salaries of two or more employees that exceed in the aggregate one hundred dollars during the period specified in division (D)(1)(e) or (f) of this section, as applicable, the full name of the employees' employer and the full name of the labor organization of which the employees are members, if any.

O.R.C. § 3517.1011(D)(1)(a)-(f).  For purposes of the disclosure requirement, "a person shall be considered to have made a disbursement if the person has entered into a contract to make the disbursement." O.R.C. § 3517.1011(B).

## II.    DISCUSSION

Plaintiff ORTL contends that Ohio's blackout provision is vague and overbroad in violation of Plaintiff's First Amendment rights of free speech and free association.  (Pl.'s Am. Mot. for Prelim. Inj. at 5-11; Reply at 3; Compl. ¶¶ 22-23, 33, 35-36, 38, 41-42, 44-45, 53). Consequently, Plaintiff seeks declaratory relief and an order enjoining Defendants from enforcing the blackout provision because that provision is facially unconstitutional. (Compl. at Prayer for Relief, ¶¶ 1, 6).  Alternatively, Plaintiff seeks an order enjoining the enforcement of the blackout provision from being applicable to the proposed ORTL broadcast ads, or any similar ads, through adopting a narrowing construction of O.R.C. § 3517.1011(H) that limits the statute's application to express advocacy or its functional equivalent. (*See Id*. at ¶ 2). Defendants admit that the Supreme Court's ruling in *Federal Election Comm'n v. Wisconsin Right to Life, Inc. (WRTL)*, 127 S.Ct. 2652 (2007) precludes enforcement of Ohio's blackout provision with regard to the two sample ads attached to Plaintiff's Complaint during the 30-day

-7-

period preceding the November 4, 2008 election. (Defs.' Memo. in Opp. at 9; OEC and OEC

Members' Answer ¶ 38; Secretary of State's Answer ¶¶ 39-40).  Defendants assert, however,

that Plaintiff's motion should be denied at the outset because Plaintiff lacks Article III standing.

(Defs.' Memo. in Opp. at 1, 5-8).  Alternatively, Defendants argue that Plaintiff cannot succeed

on a facial challenge to Ohio's blackout provision. (*Id.* at 8-12).

In addition, Plaintiff ORTL challenges Ohio's disclosure scheme, arguing that the

disclosure requirements are vague and overbroad in violation of Plaintiff's First Amendment

rights of free speech and free association. (Pl.'s Am. Mot. for Prelim. Inj. at 6, 11-17; Reply at 3-

5; Compl. ¶¶ 24-25, 33, 35-36, 38, 49, 53).  Consequently, Plaintiff seeks declaratory relief and

an order enjoining Defendants from enforcing Ohio's disclosure provisions because those

provisions are facially unconstitutional. (Compl. at Prayer for Relief, ¶¶ 3, 6).  Alternatively,

Plaintiff seeks an order enjoining the enforcement of Ohio's disclosure provisions from being

applied to ORTL, its members and the proposed broadcast ads, or any similar ads, through

adopting a narrowing construction of O.R.C. § 3517.1011 that (1) survives strict scrutiny; (2)

limits the applicability of the statute "to no more than 60 days prior to the election"; (3) limits

the applicability of the statute to electioneering ads that are the "functional equivalent of express

advocacy"; and (4) "limits the onerous regulatory burden of disclosure of contributions and

expenditure to a reasonable level." (*Id.* at ¶ 4).  Defendants contend that ORTL is unlikely to

prevail on the merits of its claims regarding Ohio's disclosure requirements, and therefore argue

that the Court should deny ORTL's motion. (Defs.' Memo. in Opp. at 12-22).

For the following reasons, the Court finds Defendants' standing arguments unpersuasive,

but agrees that Ohio's blackout provision survives Plaintiff's facial challenge.  The Court

concludes, however, that an injunction is warranted with regard to Ohio's blackout provisions as applied to Plaintiff's two proposed broadcast ads.  With respect to Plaintiff's challenge of Ohio's disclosure provisions, the Court finds that a preliminary injunction is not warranted.  The Court addresses Plaintiff's challenges to Ohio's blackout provision and disclosure requirements in turn.

**A.**    **30-Day Blackout Provisions (O.R.C. § § 3517.01(B)(6) and 3517.1011(H))**

The Court first addresses Defendants' arguments with respect to standing and then turns to the merits of Plaintiff's facial and as-applied challenges to Ohio's blackout provision.

**1.**    **Standing**

Defendants argue that Plaintiff lacks standing because there is no recognizable controversy or injury. (Defs.' Memo. in Opp. at 5).  More specifically, Defendants assert that "Plaintiff has failed to provide any indication of a specific objective chilling effect establishing the type of injury needed for Article III standing" and that the "injury alleged is far too illusory and conjectural to establish standing." (*Id*. at 7).  To support this assertion, Defendants maintain that Plaintiff has not taken enough steps towards producing the ads, specifically noting that Plaintiff has not secured air time, identified a target market, established a budget, or filed with the Secretary of State indicating an intention to broadcast these advertisements.  (*Id*. at 7-8). Defendants conclude that Plaintiff's failure to take these steps means that "there is no way of knowing that this is anything but a speculative lawsuit," and that "Plaintiff's subjective perception that it would have been disciplined for broadcasting its advertisements" does "not constitute an adequate or specific objective harm" sufficient to establish Article III standing. (*Id*. at 8).  The Court finds Defendants' arguments unpersuasive.

"[J]urisdiction is tested by the facts as they existed when the action [was] brought," and

"after vesting, it cannot be ousted by subsequent events." *Smith v. Sperling*, 354 U.S. 91, 93 n. 1 (1957) (citation omitted).  Therefore, standing "is to be determined as of the time the complaint is filed." *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 524 -525 (6th Cir. 2001).  The U.S. Supreme Court recently discussed the requirements for establishing Article III standing:

> To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling. . . . [T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed. . . . [T]he injury required for standing need not be actualized.  A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct.

*Davis v. Federal Election Commission*, 128 S.Ct. 2759, 2768-69 (2008) (citations omitted).  In the context of a First Amendment challenge, the Supreme Court has found that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (citations omitted).

Plaintiff had faced such a prospective injury when it filed suit.  The Court finds, and Defendants have implicitly admitted (*See* Defs.' Memo. in Opp. at 9), that Ohio's blackout provision would operate to ban the two draft broadcast ads that Plaintiff attached to their Complaint.  If Plaintiff ran the ads within 30 days of an election, it could be subjected to civil penalties and even criminal prosecution.  Under these circumstances, the Court concludes that Plaintiff faced the requisite injury when it filed suit and has standing to challenge Ohio's blackout provision.

In so finding, the Court rejects Defendants' arguments that the injury alleged is "too

illusory or conjectural" because Plaintiff has not taken enough steps towards producing the ads.

Plaintiff has undisputedly entered into contracts and committed resources to have these broadcast

ads developed. The ads were developed and submitted as exhibits to Plaintiff's Complaint.

Defendants have not cited to any bright-line test and have not provided the Court with any

authority that stands for the proposition that a plaintiff needs to take a certain amount of steps

before the injury becomes objective rather than subjective.

Defendants also argue that "Plaintiff cannot demonstrate the need for injunctive relief

regarding [the blackout] provision" because "[a]ll the Defendants have conceded that the U.S.

Supreme Court's ruling in *WRTL* precludes enforcement of R.C. 3517.1011(H) and R.C.

3517.01(B)(6) with regard to the two ads attached to Plaintiff's Complaint during the thirty-day

period preceding the November 4, 2008 general election." (*Id*. at 9 *citing* OEC and OEC

Members' Answer ¶ 38; Secretary of State's Answer ¶¶ 39-40). Defendants' admission, which

was made in their Answers, however, is irrelevant and does not alter this Court's conclusion with

respect to standing. As set forth above, standing is determined at the time the Complaint is filed,

and Defendants' admission came after the Complaint. Regardless, Defendants' admission does

not amount to an agreement not to enforce Ohio's blackout provisions against Plaintiff's

proposed ads, and Defendants have produced no evidence of such an agreement to this Court.

Having concluded that Plaintiff has standing to assert its challenges to Ohio's blackout

provision, the Court now turns to the merits of Plaintiff's claims.

### 2.      Facial Challenge

Plaintiff argues that Ohio's blackout provision is facially unconstitutional under the

standards established in *WRTL*. (Pl.'s Am. Mot. for Prelim. Inj. at 5). Defendants counter, and this Court agrees, that Plaintiff's facial challenge fails because *WRTL* expressly did not alter *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), which held that the blackout provision in Section 203[2] of the Bipartisan Campaign Reform Act of 2002 ("BCRA") is facially valid. (*See* Defs.' Memo. in Opp. at 9-10).

As a preliminary matter, Plaintiff is correct in concluding that Ohio's blackout provision, because it burdens political speech, is subject to strict scrutiny. *See, e.g.*, *WRTL*, 127 S.Ct. at 2554; *McConnell*, 540 U.S. at 205.

In *McConnell*, the Supreme Court, applying strict scrutiny, upheld the BCRA's blackout provision against a First Amendment facial challenge, acknowledging that the provision covered not only "express advocacy," but also "issue advocacy." 540 U.S. at 204-207. The Court concluded that the provision was not overbroad to the extent it regulated express advocacy or the "functional equivalent" of express advocacy. *Id*. at 206. The Court did note, however, that "the interests that justify the regulation of campaign speech might not apply to the regulation of genuine issue ads." *Id*. at 206, n. 88. Nevertheless, the Court found that the provision was not facially overbroad, stating: "[e]ven if we assumed that the BCRA will inhibit some constitutionally protected corporate and union speech, that assumption would not 'justify prohibiting all enforcement' of the law" where it had not been established that the provision's "application to pure issue ads is substantial." *Id*. at 207 (*quoting Virginia v. Hicks*, 539 U.S. 113,

---

[2]BCRA § 203 prohibits a corporation from using funds to pay for any "electioneering communication," which the BCRA defines as any broadcast that refers to a candidate for federal office and is aired within 30 days of a federal primary election or 60 days of a federal general election in the jurisdiction where that candidate is running.

120 (2003).

In *WRTL*, the Supreme Court limited its examination of the BCRA's blackout provision to an "as-applied" challenge, precluding any facial challenge, on the basis of the Court's ruling in *McConnell*. 127 S.Ct. at 2659.  In deciding the as-applied challenge, the *WRTL* Court stated "[w]e have no occasion to revisit *McConnell's* conclusion that the statute is not facially overbroad." *Id*. at 2670, n.8.  Indeed, even Plaintiff has admitted that *WRTL* extended no further than an as-applied challenge. (Pl.'s Am. Mot. for Prelim. Inj. at 8-9).

Plaintiff seeks to distinguish *McConnell* from the instant case by arguing that the *McConnell* decision relied on an extensive factual record to establish a compelling state interest and least restrictive alternative. (*See* Pl.'s Am. Mot. for Prelim. Inj. at 9).  Specifically, Plaintiff argues that "there is no factual record in support of the provisions of Ohio H.B. 1 that became O.R.C. § 3517.01(B)(6) & O.R.C. § 3517.1011." (*Id.*).  Defendants point out that the lack of legislative history is "chiefly due to the fact that Ohio does not retain records of legislative history." (Defs.' Memo. in Opp. at 10).  Defendants maintain that the same concerns of corruption and appearance of impropriety articulated in *McConnell* apply to Ohio elections, noting that "Ohio spent four years defending its own attempts to regulate television advertisements masquerading as 'issue ads' although they advocated the defeat of a judicial candidate for the Ohio Supreme Court (*Id*. (*citing Citizens for a Strong Ohio v. Marsh*, 123 Fed. Appx. 630, 2005 U.S. App. LEXIS 67 (6th Cir. 2005); *U.S. Chamber of Commerce v. Ohio Elections Comm'n.*, 123 F. Supp. 2d 857 (S.D. Ohio 2001); *Ohio Elections Comm'n. v. Ohio Chamber of Commerce*, 158 Ohio App. 3d 557 (10th Dist. 2004)).  The Court agrees with Defendants that the same compelling interests leading the *McConnell* Court to uphold BCRA §

203 apply equally to Ohio's disclosure provisions.

To the extent Ohio's blackout provision regulates express advocacy or its functional equivalent, this Court, like the *McConnell* and *WRTL* Courts, concludes that the provision survives strict scrutiny.  The Court now turns to Plaintiff's as-applied challenge to Ohio's blackout provisions.

### 3.    As-Applied Challenge

As set forth above, with respect to Plaintiff's as-applied challenge to Ohio's blackout provision, Defendants expressly "have conceded that the U.S. Supreme Court's ruling in *WRTL* precludes enforcement of R.C. 3517.1011(H) and R.C. 3517.01(B)(6) with regard to the two ads attached to Plaintiff's Complaint during the thirty-day period preceding the November 4, 2008 general election." (Defs.' Memo. in Opp. at 9 *citing* OEC and OEC Members' Answer ¶ 38; Secretary of State's Answer ¶¶ 39-40).  The Court agrees that *WRTL* operates to preclude enforcement of Ohio's blackout provision with respect to the two proposed ads.

In *WRTL*, the Court articulated the proper standard for an as-applied challenge to the BCRA's blackout provision: "[A] Court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S.Ct. at 2667.  Applying this standard, the Court found that the plaintiff's proposed ads were not the functional equivalent of express advocacy, and therefore concluded that the ads fell outside the scope of *McConnell's* holding. *Id*. at 2670.  Applying strict scrutiny, the Court concluded that because the proposed speech was not express advocacy or its functional equivalent, there was no interest sufficiently compelling to justify burdening it. *Id*. at 2673.

-14-

In the instant case, Plaintiff's two proposed ads are nearly identical to the ads at issue in *WRTL*. Like the *WRTL* proposed ads, Plaintiff's proposed ads do not consist of express advocacy or the functional equivalent of express advocacy. And, like the *WRTL* Court, the Court finds that Defendants have not identified an interest sufficiently compelling to justify burdening Plaintiff's speech. Consequently, the Court finds that Ohio's disclosure provision is unconstitutional as applied to Plaintiff's two proposed ads.

**B.      Disclosure Provisions (O.R.C. § 3517.1011)**

Plaintiff ORTL contends that the disclosure requirements of O.R.C. § § 3517.1011 and 3517.01(B)(6), both on their face and as applied to Plaintiff's proposed ads, violate ORTL's First Amendment rights. (Pl.'s Am. Mot. for Prelim. Inj. at 11). Plaintiff bases its challenge on its interpretation of *WRTL*, several "anonymous speech" cases, and its interpretation of the Supreme Court's recent decision in *Davis v. Federal Elections Commission*, 128 S.Ct. 2759 (2008). (*Id.* ; Reply at 3-6). Plaintiff maintains that the Court should apply strict scrutiny in analyzing Ohio's disclosure provisions because the provisions place restrictions on core political speech. (Reply at 1-2). Defendants argue, and this Court agrees, that the appropriate standard of review regarding campaign finance disclosure laws is intermediate, not strict scrutiny. (*See* Defs.' Memo. in Opp. at 12-13). Defendant further argues that *McConnell* is determinative of Plaintiff's constitutional challenge. (*Id.* at 14-15). Again, the Court agrees.

With respect to campaign finance disclosure provisions, the Supreme Court has consistently applied an intermediate level of scrutiny. *See e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 64-66 (1976); *McConnell*, 540 U.S. at 196. In *Buckley*, the Supreme Court reviewed comprehensive federal reporting and record-keeping requirements for political committees as well as more

limited reporting requirements for independent expenditures. *See Buckley*, 424 U.S. at 60-82.

The standard of review established by the Court was whether there was a "'relevant correlation'

or 'substantial relation' between the governmental interest and the information required to be

disclosed." *Id.* at 64. The Court indicated that this level of review was appropriate because

disclosure requirements "appear to be the least restrictive means of curbing the evils of campaign

ignorance and corruption that Congress found to exist." *Id.* at 68 (footnotes omitted).  The Court

explained that disclosure requirements are described as the "least restrictive" because they

"impose a ceiling on campaign-related activities." *Id.* at 68.  In *McConnell*, the Court did not

explicitly state the standard of review with respect to disclosure requirements.  The Court's

opinion made clear, however, that the Court was adopting *Buckley's* standard of review,

upholding the BCRA's disclosure requirements as supported by "important state interests." 540

U.S. at 196*.*

Applying intermediate scrutiny, the *McConnell* Court upheld BCRA § 201,[3] a disclosure

provision, against a First Amendment challenge. *Id.*   In reaching this holding, the Court relied

on the analysis in *Buckley*, in which the Court identified "important state interests" that

supported Federal Election Campaign Act ("FECA") disclosure provisions: "the important state

interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements—providing

the electorate with information, deterring actual corruption and avoiding any appearance thereof,

and gathering the data necessary to enforce more substantive electioneering restrictions—apply

---

[3]BCRA § 201 requires any corporation spending more than $10,000 in a calendar year to produce or air electioneering communications to file a report with the FEC that includes the names and addresses of anyone who contributed $1,000 or more in aggregate to the corporation for the purpose of furthering electioneering communications.

in full to BCRA." *Id*.  The Court then indicated that these "important interests" supported

disclosure of "the entire range of 'electioneering communications.'" *Id*. at 196-97.

Plaintiff ORTL argues that *WRTL* provides a basis for overturning the 8-1 decision of the

*McConnell* Court upholding electioneering communication disclosure requirements.  Plaintiff

contends that *WRTL* decision establishes that:

> [T]here are only two types of political communications that can be regulated
> without violating the First Amendment guarantee of freedom of speech: (i) a
> political communication that contains words that expressly advocate the election
> or defeat of a candidate; and (ii) a narrowly defined category of communications
> that are the functional equivalent of express advocacy, insofar as the expression is
> susceptible of " … no reasonable interpretation other than as an appeal to vote for
> or against a specified candidate."

(Pl.'s Am. Mot. for Prelim. Inj. at 3 (*citing WRTL*, 127 S. Ct. at 2667 and *McConnell*, 540 U.S.

93)).  The Court disagrees.  The *WRTL* Court made clear that the Court was only considering the

constitutionality of the BCRA's federal electioneering funding prohibition as applied to the

plaintiff's specific ads.  The *WRTL* Court did not even mention disclosure requirements, much

less consider their constitutionality.  And, though the *McConnell* Court left open the possibility

of as-applied challenges to the BCRA's blackout provision (the issue presented in *WRTL*), the

Court sustained the BCRA's disclosure provision for the "entire range of 'electioneering

communications.'"

The U.S. District Court for the District Court of Columbia recently considered and

rejected the same arguments that Plaintiff ORTL makes in the instant case. *See Citizens United v.

FEC*, 530 F.Supp.2d 274 (D.D.C. 2008).  The *Citizens United* plaintiff, like Plaintiff ORTL,

sought an injunction of electioneering communication disclosure provisions, arguing that

*WRTL* permits application of disclosure requirements only as to ads that contain express

advocacy or its functional equivalent. *See id.* at 280. The *Citizens United* court denied the injunction, concluding as this Court does that *WRTL* did not alter *McConnell's* holding with respect to disclosure requirements. *Id.* at 281. The court explained:

> We know that the Supreme Court has not adopted that line as a ground for holding the disclosure and disclaimer provisions unconstitutional, and it is not for us to do so today. And we know as well that in the past the Supreme Court has written approvingly of disclosure provisions triggered by political speech even though the speech itself was constitutionally protected under the First Amendment.

*Id.* (footnote omitted) (citations omitted).

Plaintiff ORTL next seeks to rely on several decisions it claims establish that "the issue advocate may always wear the cloak of anonymity." (Pl.'s Am. Mot. for Prelim. Inj. at 12-13). Again, Plaintiff's reliance is misplaced.

Plaintiff quotes *NAACP v. Alabama*, 357 U.S. 449 (1958) for the proposition that "it is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy *may* constitute . . . a restraint on freedom of association." (Pl.'s Am. Mot. for Prelim. Inj. at 13 (*citing NAACP*, 357 U.S. at 462) (emphasis added)). Plaintiff, however, omits that the *NAACP* Court found that the NAACP had "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *NAACP*, 357 U.S. at 462. Based upon this factual showing, the Court concluded: "[u]nder these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioners and its members" to freely associate. *Id.* at 462-63. Relying on *NAACP*, the Supreme Court in *Buckley* rejected a claim that campaign finance disclosure requirements violate the First Amendment

rights of minor parties and independent candidates and articulated a rigorous test for exemption from a disclosure statute, namely that the regulated party had to demonstrate a "reasonable probability" that the disclosure would subject the regulated parties to "threats, harassment, or reprisals from either Government officials or private parties." *Buckley*, 424 U.S. at 74. *See also McConnell*, 540 U.S. at 198, 199 (reiterating Buckley's standard for as-applied challenges). Thus, although these cases do suggest circumstances in which the at-issue disclosure requirements might be unconstitutional as applied, in the instant case, Plaintiff ORTL has not even attempted to establish a record that would permit this Court to conclude that its contributors face a real threat of retaliation if their names were disclosed. *See also Citizen United*, 530 F.Supp.2d at 281 (noting that plaintiff "states that there may be reprisals, but it has presented no evidence to back up this bald assertion").

Plaintiff ORTL's reliance on *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), is also misplaced. (*See* Pl.'s Am. Mot. for Prelim. Inj. at 15-16.)  Like *NAACP*, *McIntyre* did not involve candidate elections and the important state interests present in the candidate election context.  Instead, the disclosure statute struck down in *McIntyre* had required the ballot initiative handbill at issue in the case to identify the author of the literature. The Supreme Court noted that no anti-corruption interest was implicated by ballot initiative activity, in contrast to lobbying, because the former has no nexus to candidates, political parties or officeholders. *McIntyre*, 514 U.S. at 356, n.20.  Further, the Supreme Court noted the limited utility of information required by the statute in *McIntyre*—i.e., the identification of private individuals who may make at most minimal expenditures for a ballot initiative handbill. *Id*. at 348-49. Whereas the ads in the instant case relate to candidates for office and trigger disclosure

requirements only when their value exceeds $10,000, in *McIntyre* the handbill made no mention of candidates and had been produced at insubstantial cost. The *McIntyre* decision therefore does not bear upon this Court's analysis of the constitutionality of O.R.C. § 3517.1011.

The Supreme Court's decision in *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002), likewise has no bearing on this case because *Watchtower* involved neither candidate election related disclosure, nor lobbying disclosure. The *Watchtower* Court struck down a municipal license requirement for door-to-door canvassing, but gave no consideration whatsoever to the unique government interests at stake in the context of candidate election advertising and lobbying.

Finally, Plaintiff contends that the Supreme Court's recent holding in *Davis v. Federal Election Commission* provides a basis for overturning *McConnell*. (*See* Reply at 3-6).  Plaintiff maintains that the *Davis* Court applied strict scrutiny and that the Court's holding that BCRA § 319 is unconstitutional "is extremely important to the issues presented in this case." (*Id.*).  The Court disagrees.

In *Davis*, a self-financed candidate for a seat in the United State House of Representatives brought a facial challenge to BCRA § 319, the so-called "Millionaire's Amendment" of the BCRA.  128 S.Ct. at 2766-67.  The *Davis* Court explained that federal law places limits on the amount of money a candidate may receive from an individual or from the candidate's party and that these limits apply to all competitors for a seat, but how the challenged provision, BCRA § 319(a), alters this scheme when a candidate's expenditure of personal funds exceeds $350,000. *Id*. at 2765-66.  Once a candidate's expenditure of personal funds exceeds this mark, an asymmetrical regulatory scheme comes into play, which allows the candidate's

opponent to receive individual contributions at treble the normal limit. *Id*. at 2766.  To enforce BCRA § 319(a), § 319(b) requires candidates to disclose: (1) their intent, if any, to cross the threshold amount of personal expenditure; (2) a notice within 24 hours of when they cross the threshold; and (3) each additional expenditure of $10,000 or more using personal funds within 24 hours of such an expenditure.  The Court determined that BCRA § § 319(a) and (b) violated the First Amendment. *Id*. at 2775.  In reaching this conclusion, the Court explained that § 319(a) does not simply raise contribution limits for all candidates, but instead raises the limits only for the non-self-financing and does so only after the self-financing candidate spends more than $350,000 of personal funds. *Id*. at 2771.  The Court stated "[w]e have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other." *Id*.  The Court found that the burden imposed by § 319(a) was not justified by any governmental interest in eliminating corruption or the perception of corruption, and agreed with the *Buckley* Court that "reliance on personal funds *reduces* the threat of corruption, and therefore § 319(a), by discouraging use of personal funds, disserves the anticorruption interest." *Id*. at 2773. The *Davis* Court then considered the constitutionality of BCRA § 319(b)'s disclosure requirements. *Id*. at 2774.  Contrary to Plaintiff ORTL's assertion, the *Davis* Court did not apply strict scrutiny, but instead utilized the same standard of review established by the *Buckley* Court, stating "there must be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed . . . . That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id*. at 2775 (*quoting Buckley*, 424 U.S. at 64).  The *Davis* Court concluded that  § 319(b)'s disclosure requirements could not be justified because they were

designed to implement the asymmetrical contribution limits provided for in § 319(a), which the Court had found to be unconstitutional. In the instant case, the at-issue disclosure requirements are not designed to implement another provision that has been found to be unconstitutional. Instead, the Court finds that Ohio's disclosure requirements are supported by the same important state interests identified by the *Buckley* and *McConnell* Courts as supportive of the FECA and BCRA disclosure provisions. Therefore, the Court does not find *Davis* instructive in the Court's analysis of the constitutionality of O.R.C. § 3517.1011.

### C.    Application of the Preliminary Injunction Standard

The Court must consider four factors in determining whether to issue a preliminary injunction:

> (1) whether the movant has a strong or substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the relief requested; (3) whether issuance of the injunction will cause substantial harm to others; and (4) whether the public interest will be served by issuance of the injunction.

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004). These four factors are "to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condominium Assoc.*, 328 F.3d 224, 230 (6th Cir. 2003); *see also Capobianco, D.C. v. Summers*, 377 F.3d 559, 561 (6th Cir. 2004). Notwithstanding this balancing approach, the likelihood of success and irreparable harm factors predominate the preliminary injunction inquiry. The Sixth Circuit has noted, however, that "[i]n First Amendment cases, the first factor will often be determinative." *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 274 F.3d 377, 400 (6th Cir. 2001) (*citing Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

As set forth in detail above, Plaintiff has demonstrated a likelihood of success on the merits with respect to its as-applied challenge to Ohio's blackout provision.  Consequently, the Court finds that if Defendants were not enjoined from enforcing Ohio's blackout provision with regard to the two ads attached to Plaintiff's Complaint, Plaintiff would suffer irreparable injury. *See Deja Vu of Nashville*, 274 F.3d at 400 ("[T]he Supreme Court has recognized that even minimal infringement upon First Amendment values constitutes irreparable injury." (citation omitted)).  Moreover, no substantial harm is inflicted on others merely by protecting Plaintiff's First Amendment rights.  *See Deja Vu of Nashville*, 274 F.3d at 400 ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." (citation omitted)).  Indeed, Defendants have conceded that *WRTL* precludes enforcement of the blackout provision with respect to the two proposed ads.  (Defs.' Memo. in Opp. at 9 *citing* OEC and OEC Members' Answer ¶ 38; Secretary of State's Answer ¶¶ 39-40).  Thus, the Court concludes that the threatened injury outweighs any damage that the injunction may cause to others.  Finally, issuance of a preliminary injunction will serve the public interest because "it is always in the public interest to prevent violation of a party's constitutional rights." *Deja Vu of Nashville*, 274 F.3d at 400 (citation omitted).

With respect to Plaintiff's facial challenge to the blackout provision and its challenges to Ohio's disclosure provisions, as set forth above, Plaintiff has failed to demonstrate a likelihood of success on the merits.  As to the remaining factors governing preliminary relief, the Court finds that any injury to Plaintiff's First Amendment interests is outweighed by the state interests at issue.  Finally, the Court finds that enjoining the at-issue provisions would not serve the public interest in view of the Supreme Court's determination that such provisions serve the public by

providing the electorate with information to assist the public in making informed decisions, deterring actual and perceived corruption, limiting the coercive effect of corporate speech and gathering data necessary to enforce more substantive electioneering restrictions. *See McConnell*, 540 U.S. at 196, 205, 231. Accordingly, the Court denies Plaintiff's Motion for a Preliminary Injunction with respect to these claims.

In summary, the Court finds that Plaintiff has demonstrated a likelihood of success on the merits with respect to its as-applied challenge to Ohio's blackout provision and that issuance of a preliminary injunction to enjoin Defendants from enforcing Ohio's blackout provision with regard to the two proposed ads would prevent irreparable injury to Plaintiff, not unduly damage Defendants and is in the best interest of the public. With respect to Plaintiff's other claims, however, Plaintiff has failed to demonstrate a likelihood of success on the merits, any injury to Plaintiff is outweighed by state interests, and an injunction is not in the best interest of the public.

### III.    CONCLUSION

For the foregoing reasons, Plaintiff ORTL's Motion for a Preliminary Injunction is **GRANTED IN PART and DENIED IN PART.** Plaintiff's Motion for a Preliminary Injunction with respect to Ohio's blackout provisions as applied to the two proposed broadcast ads is **GRANTED.** Plaintiff may therefore run the two ads attached to its Complaint during the thirty-day period preceding the November 4, 2008 general election, and Defendants are enjoined from enforcing Ohio's blackout provision with regard to the two proposed ads. Plaintiff's Motion for a Preliminary Injunction is **DENIED** with respect to all other claims.

-24-

The Clerk shall remove Documents 19 and 20 from the Court's pending motions list.

**IT IS SO ORDERED.**

        **/s/ George C. Smith**             
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**